**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL NOLAN, KARLA BOUSQUET, JAY ZELTZER, TERESA COOK, and RANDALL BLANCHARD<br><br>     ***Plaintiffs***,<br><br>   v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION and KYNDRYL HOLDINGS INC.<br><br>     ***Defendants***. | Case no.: 7:24-cv-4653 |

## ORIGINAL COMPLAINT

Plaintiffs Michael Nolan, Karla Bousquet, Jay Zeltzer, and Teresa Cook bring this action against International Business Machines Corporation (IBM) under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634. Plaintiff Randall Blanchard brings this action against Kyndryl Holdings, Inc. (Kyndryl) under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634 (ADEA). Plaintiffs allege as follows:

## I.    STATEMENT OF THE ACTION

### A. INTRODUCTION

1.    These Plaintiffs' illustrious careers were cut short by an ageist scheme created and executed by IBM. A scheme or "transformation" which was later adopted and continued by IBM's spin-off company Kyndryl. The U.S. Equal Employment Opportunity Commission has already conducted an independent and thorough investigation of IBM's scheme and found "reasonable cause to

believe that [IBM] has discriminated against [older workers] on account of their age."[1] ProPublica has also extensively written about IBM's nefarious plan to eliminate older workers. That scheme is alive and well today. These Plaintiffs are the latest victims.[2]

2.     Over the last several years, IBM's leadership has embarked on a massive "reinvention" and rebranding campaign aimed at attracting younger employees, which IBM internally referred to as Early Professional Hires ("EPH").   Younger employees are key for IBM, because the company is faced with major competition from other companies acquiring younger workers in the tech sector and beyond.  Accordingly, IBM developed a strategy to "bring in as much *young* talent into the workforce[.]"[3]

3.     It was not only IBM's rosy assessment of young people's potential that drove its "transformation," but a growing corporate culture that not only questioned the relative value of older workers, but increasingly perceived their ability to contribute with contempt. In an IBM publication, "Myths, exaggerations and uncomfortable truths – The real story behind Millennials in the workplace," IBM flattered the Millennial generation it sought to recruit.[4] Simultaneously, ProPublica reports that IBM was disparaging older Gen X and Baby Boomer employees. In the

---

[1] **Ex. 1**,  IBM Corporation's U.S. EEOC Determination, pgs. 1 – 2. (September 3, 2020). ("The Commission's investigation reveals that Respondent conducted Resource Actions analyzed by the EEOC between 2013 and 2018 that had an adverse impact on employees in the protected age group (PAG). The investigation uncovered top-down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires.")

[2] Peter Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of Discrimination at IBM*, PROPUBLICA, (Sept. 11, 2020) https://www.propublica.org/article/the-u-s-equal-employment-opportunity-commission-confirms-a-pattern-of-age-discrimination-at-ibm.

[3]  Shivani Shinde Nadhe, *IBM's new team to focus on millennials*, BUSINESS STANDARD (May 31, 2024) https://www.business-standard.com/article/companies/ibm-s-new-team-to-focus-on-millennials-116053000677_1.html

[4] Mark Eltringham, *Myths and Uncomfortable Truths*, WORK PLACE INSIGHT (Feb. 27, 2015) https://workplaceinsight.net/ibm-exposes-myths-exaggerations-and-uncomfortable-truths-about-generation-y/.

---

investigating reporting article, "Cutting Old Heads at IBM", IBM there is a quote from an IBM consulting services titled "The Maturing Workforce" in which  referred to older workers as "gray hairs" and "old heads".[5] Years later, IBM publicly doubled down on these stereotypes, characterizing older employees as suffering from workplace "dysfunctions."[6] Finding that "older employees" were allegedly less trusting of their co-workers, less collaborative, less committed, less accountable, and less attentive to results.[7] Compared to younger employees, IBM found that Boomers were the least likely to understand IBM's business strategy, least likely to understand their manager's expectations of them, least likely to understand what customers wanted, and the least likely to understand IBM's brand.[8] And while these publications may be from several years ago, IBM's focus on the youngest generations is consistent and current. Within the last 90 days, IBM published an article aimed at "get[ting] the Gen Z generation excited about good-paying jobs" at IBM.[9]

4.      IBM executives have bought in to the stereotype that younger people are better at learning, understanding, and selling technology than its seasoned workforce. Internal documents show that IBM's highest executives harbored an age bias, which continues to this day. Those at the company's zenith love the ***energy*** of the youthful and applaud derogatory and demeaning terms for IBM's experienced older workers. As reported by the *New York Times*, top IBM executives were directly involved in discussions about the need to reduce the portion of older employees at

---

[5] Peter Gosselin, *Cutting 'Old Heads' at IBM*, PROPUBLICA (March 22, 2018) https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/
[6] Managing Millennials: 5 Common Issues Leaders Face (August 24, 2016). The original content has been removed.
[7] *Id.*
[8] *Id.*
[9] IBM Z for Gen Z Part 1 March 22, 2024, https://community.ibm.com/community/user/ibmz-and-linuxone/blogs/sandeep-batta/2024/03/22/ibm-z-for-gen-z-part1?communityKey=b8b88f20-24c8-49f0-9021-4a8c6247a067.

the company, sometimes disparaging them with the term "dinobabies."[10] This animus motivated IBM to create and conceal a company-wide, multi-faceted "fire-and-hire" scheme to attain its ultimate goal—making IBM's workforce younger.

### B. IBM'S AGEIST SCHEME.

5.      IBM began to use a series of company-wide methods to target and eliminate older workers while protecting and hiring younger employees. The scheme came from the highest levels of IBM. A cadre of top executives developed and implemented the plan while the Human Resources and Finance weaponized artificial intelligence and scoring algorithms against IBM's older workers. Finance made the math work, providing the business case for mass exits of older employees. The company employed the use of biased predictive analytics to target older populations for lay-offs. Cognizant that its efforts to "revitalize" its workforce violated anti age-discrimination laws, IBM Legal devoted significant time and resources to devising tactics and procedures to avoid detection.

6.      Veiled corporate language, employed by the highest-level executives, worked to obscure that actions were being taken, designed to fire the old to make way for the young. Executive planning documents, previously obtained by undersigned counsel, are replete with terms such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation"—catchy corporate coded language that permitted executives to speak about illegal discrimination in a way that avoided detection, gave cover, and provided plausible deniability.  As of late 2021, IBM confirmed

---

[10] Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force,* THE NEW YORK TIMES (February 12, 2022)
https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html

that many of these documents "provide insight into IBM's decision-making processes that are still being used today."[11]

7.      To execute the scheme, IBM's executives mandated companywide rolling layoffs—which IBM called "Resource Actions"—that were designed to disproportionately target and terminate older workers. This scheme was companywide--but purposefully broken up into smaller sub-groups to better shroud its discriminatory animus in secrecy.

8.      Orders were given to create impossible-to-meet performance goals for older workers. Failure to achieve the impossible was then used by IBM to create baseless negative performance reviews to justify subsequent terminations. IBM also employed techniques to reduce employees' favorable performance review scores—which gave cover for terminations.

9.      There exists evidence that the HR department and executives several levels up from an employee's front-line manager placed employees on secret internal Resource Action "RA" lists that marked them for termination before first-line managers even knew that their subordinate had been pre-selected for termination. IBM would then use first-line managers as cat's paws for the discriminatory termination pre-approved by HR. HR would then obfuscate this termination decision to make it seem like it was actually the first-line manager's decision to terminate that employee.

10.     In *Langley v. IBM*, a Federal Court in Texas analyzed this exact issue, and ruled that "internal IBM corporate planning documents" provided cause for the Court to establish a fact question as to if "IBM executives sought to lay off older workers in an effort to hire a younger workforce." The Court additionally determined that evidence existed that IBM's hire-and-fire

---

[11] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2.

scheme effectively told first-line managers who to lay off, and then used them to further conceal IBM's top-down ageist animus.[12] The Southern District of New York has also weighed similar documents—and declared that they would be "directly relevant" to the ADEA claims made here that would "on their face appear to show an effort to remove older employees in favor of younger employees."[13]

11.     While simultaneously firing its older workers—IBM was busy hiring young employees, *en masse* to replace the older workers that were laid off. To hide the replacement, IBM would frequently create different job titles and shift organizational structures to make it harder to detect that they had not eliminated a position, but instead merely replaced older workers with younger workers.

12.     To ensure that the Resource Actions did not accidently target IBM's coveted young Early Professional Hires, IBM skewed the pool of people who could be targeted by creating policies that explicitly excluded younger employees, despite their job performance, from the rolling layoffs.

13.     IBM also employed complex and byzantine procedures to prevent the targeted older employees from finding news job at IBM for which they were qualified. This included policies that prohibited laid off executives from transitioning into new roles or new jobs at a lower level.

---

[12] *Langley v. Int'l Bus. Machines Corp.*, No. 1:18-CV-443-DAE, 2020 WL 8052973, at *4 (W.D. Tex. Feb. 28, 2020) ("In this case, the evidence creates a factual issue as to whether [the first-line manager] was in fact effectively told whom to lay off, as well as whether her and her supervisors' attempts to place [the employee] in different positions were overruled by HR and IBM executives.").
[13] *Lohnn v. Int'l Bus. Machines Corp.,* No. 21-CV-6379 (LJL), 2022 WL 364320, at *12, *6 (S.D.NY. Jan 4, 2022), appeal withdrawn, No. 22-32, 2022 WL 182320899 (2d Cir. July 25, 2022).

There were also policies that reclassified fired older employees at IBM as retirements or performance-based terminations.[14]

## C. THE SCHEME WORKED

14.     Internal documents show that IBM's most senior executives confirmed that they believed and anticipated that the scheme would be successful, and that the percentage of young workers comprising IBM's workforce would *improve* once Resource Actions were completed. The executives were correct. The plan worked.  As found by the EEOC's multi-year investigation, statistical analysis of the data from 2013 to 2018 determined that IBM's Resource Actions targeted "primarily older workers (85.85%) in the total potential pool of those considered for layoff."[15]

15.     IBM has also continued to conceal exactly how successful the scheme was by refusing to comply with the Older Workers Benefit Protection Act ("OWBPA"). Compliance would have made IBM provide terminated employees with the ages of other workers being laid off.

## D. THE SCHEME CONTINUES. NOTHING HAS CHANGED.

16.     Far from being over, IBM continues its ageist scheme to rid itself of its older workers. In a nearly identical lawsuit against IBM based on age discrimination, a current IBM executive named Sam Ladah—in an attempt to keep ageist IBM executive level planning documents confidential— attested that all of these documents are still relevant to IBM's current business practices. To wit, he attested on August 27, 2021, that "even though some of the documents are five to six years old, they provide insight into IBM's decision-making processes that are still being used today" and that

---

[14] Similar sealed documents were discovered in prior litigation handled by the undersigned. *See Langley v. Int'l Bus. Machines Corp.*, No. A-18-CV-443-LY ,2019 WL 4577115, at *3 (W.D. Tex. Sept. 20, 2019); *see also Townsley v. Int'l Bus. Machines Corp.*, No. A-20-CV-00969-DAE, 2022 WL 2655197, at *2 (W.D. Tex. July 8, 2022).

[15] Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of Discrimination at IBM*, PROPUBLICA, (Sept. 11, 2020).

the documents contain "IBM's **current** thinking and decision making process" and that "IBM continues to hire along similar tracks today."[16]

17.     Despite announcing in 2022 that no more major layoffs would occur, in 2023, CEO Arvind Krishna approved the termination of thousands of older employees through the tried and true, "fire-and hire" Resource Action scheme. A recently leaked video of Krishna confirms that IBM has continued its practice of using secretive top-down pressure to gerrymander its workforce to reflect the demographic preferences of its Executives.[17] In this video, the CEO told employees that if they do not hire the desired race of employee, he will ensure they will lose their bonuses.

18.     In another recently filed age discrimination lawsuit, *Wimbish v IBM*, it was made clear that even HR mangers know the scheme is continuing. In their complaint, these fired HR managers alleged that IBM's HR still constantly consider an employee's "runway" when determining if that worker would be terminated. "Runway" is coded language for how long IBM HR expects an employee to remain at IBM before they retire, a direct proxy for age.[18]

19.     The *Wimbish* plaintiffs also stated that they were deeply familiar with IBM's recent and continued obsession with age during mass layoffs. These former HR managers allege that decision makers at IBM were constantly referring to a need for employees with "new skills" or "new energy"—more coded language for younger workers.[19] One *Wimbish* plaintiff even received a list of the people slated for termination, including their respective ages. This list  of "IBM's best and brightest among the HR organization—[which] were also some of the Company's older and most

---

[16] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2 (emphasis added).
[17] Okeefe Media Group, *Leaked IBM Video*, Instagram, (December 11, 2023)
https://www.instagram.com/okeefemedia/reel/C0u7vvDMypu/
[18] *See* Orig. Compl., *Wimbish v.. Int'l Bus. Machines Corp.*, 1:23-cv-08327, Sept. 20, 2023, (SDNY) ECF No. 1, at 1 – 2 (emphasis added).
[19] *Id*. at ¶ 37 – 38.

---

senior HR partners."[20] Court documents and all available evidence accordingly reveal that the ageist illegal scheme is alive and well, and that these Plaintiffs fell victim to it.

### E. IBM'S SCHEME CARRIED OVER TO ITS SPIN-OFF COMPANY KYNDRYL.

20.     In 2021, IBM spun off a new company largely comprised of its former Global Technology Services Group (GTS). This company would become Kyndryl. IBM's original discriminatory scheme germinated, in part, in the GTS Group—and it lives on at Kyndryl.

21.     Documents show that GTS benchmarked their business against outside competitors and attempted to reconcile and correct the fact that GTS had a significantly older workforce than its competitors.[21] IBM accordingly undertook to address such concerns in GTS, and most other parts of IBM—which resulted in thousands of older employees losing their jobs in the Resource Actions.

22.     During much of this time, Martin J. Schroeter was the CFO of IBM. As revealed by documents in prior IBM litigation, he was a vital and knowledgeable component of the IBM scheme.[22] These documents show Schroeter's role creating and carrying out this discriminatory scheme as well as the discriminatory animus. These documents are maintained at IBM, but they show Schroeter's role in this discriminatory plan. Schroeter then became the Chairman and CEO of Kyndryl upon it's spin off and remains in that position to date.[23]

23.     Because Kyndryl was created as a spin-off, largely of GTS, the foundational mindset of the scheme that was created and nurtured for over a decade at IBM, and the tools and processes to execute the same, were propounded to the post-IBM Kyndryl. Newly formed corporate entities of

---

[20] *Id.* at ¶ 45.
[21] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2.
[22] *Id.*
[23] Kyndryl, *Kyndryl Leadership*, https://www.kyndryl.com/us/en/about-us/leadership (last visited May 23, 2024).

this sort do not spring to life fully formed. Rather, they are created not just by transitioning employees and financial assets, but by also retaining the processes and procedures necessary to keep a complex and sizeable organization operating on a daily basis. As further proof that Kyndryl's HR procedures are heavily influenced by IBM, Kyndryl's SEC filings reveal that Kyndryl HR considers years spent at IBM as years that will count towards qualifying for "retirement" at Kyndryl for those that directly transferred.[24]

24.     In addition to cribbing former IBM HR processes and procedures, Kyndryl leased certain infrastructure and back-office support functions from IBM for a period of at least two years via a Transition Services Agreement.[25] Included in those leased services would have been access to HR and Finance capabilities and programs that were the foundation of the age discriminating layoff scheme.  Recent reporting bears out that Kyndryl has retained the scheme and is using it. Kyndryl has terminated hundreds of employees in the past few years—and the terminated group is disproportionally made up of older workers.[26]

25.     These Plaintiffs rights were violated as a result of this scheme when they suffered an adverse employment action due to their age. They now bring case to vindicate their rights under the ADEA and various State laws.

---

[24] United States Securities and Exchange Commission, *Kyndryl Form 10-K*, *Severance Plan*, SEC ARCHIVES, (March 10, 2022)
https://www.sec.gov/Archives/edgar/data/1867072/000155837022003291/kd-20211231x10k.htm.
[25] United States Securities and Exchange Commission, *Kyndryl Form 8-K, Transition Services Agreement,* SEC ARCHIVES, (November 1, 2021).
(https://www.sec.gov/Archives/edgar/data/1867072/000110465921134456/tm2131654d1_8k.htm)
[26] Thomas Claburn, *Leaked Kyndryl files show 55 was average age of laid-off US workers*, THE REGISTER (May 2023) https://www.theregister.com/2023/05/24/kyndryl_ibm_layoffs/

II.   **PARTIES**

26.    Plaintiff Michael Nolan is a citizen of the United States and is a resident of Virginia. He timely filed a charge of age discrimination with the EEOC after he was terminated at age sixty-three (63) as a direct result of IBM's ageist scheme to fire its older workers.[27]

27.    Plaintiff Karla Bousquet is a citizen of the United States and is a resident of Washington D.C. She timely filed a charge of age discrimination with the EEOC after she was terminated at age fifty-two (52) as a direct result of IBM's ageist scheme to fire its older workers.[28]

28.    Plaintiff Jay Zeltzer is a citizen of the United States and is a resident of New York. He timely filed a charge of age discrimination with the EEOC after he was terminated at age fifty-seven (57) as a direct result of IBM's ageist scheme to fire its older workers.[29]

29.    Plaintiff Teresa Cook is a citizen of the United States and a is a resident of Connecticut. She timely filed a charge of age discrimination with the EEOC after she was terminated at age fifty-five (55) as a direct result of IBM's ageist scheme to fire its older workers.[30]

30.    Plaintiff Randall Blanchard is a citizen of the United States and a is a resident of Alabama. He timely filed a charge of age discrimination with the EEOC after he was terminated at age sixty-one (61) as a direct result of Kyndryl's adoption of IBM's ageist scheme to fire its older workers.[31]

31.    Defendant IBM is a New York corporation with its principal place of business in Armonk, New York. IBM is a technology company that provides both equipment and services in the fields of computer hardware, computer software, cloud computing, data analytics and artificial intelligence. IBM is a Fortune 500 company that employs hundreds of thousands of people.

---

[27] *See* **Ex. 2**, *Nolan EEOC Charge*, **pgs. 1 – 7**.
[28] *See* **Ex. 3**, *Bousquet EEOC Charge*, **pg. 1 – 6**.
[29] *See* **Ex. 4**, *Zeltzer EEOC Charge*, **pg. 1 – 7**.
[30] *See* **Ex. 5**, *Cook EEOC Charge*, **pg. 1 – 6**.
[31] *See* **Ex. 6**, *Blanchard EEOC Charge*, **pg. 1 – 7**.

32.     Defendant Kyndryl is a Delaware corporation with its principal place of business in New York, New York. Kyndryl is a company that IBM spun-off largely from its Global Technology Services Group (GTS) in late 2021. In its current form, Kyndryl continues the work of GTS and designs, builds, and manages information technology systems for its clientele.

## III.    **JURISDICTION AND VENUE**

33.     This Court has subject matter jurisdiction over Plaintiffs' claims under 29 U.S.C. 626 (b), which authorizes federal jurisdiction over any action to enforce the ADEA. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343 because each Plaintiff is a natural person seeking redress for Defendants' violations of their civil rights under the ADEA.

34.     This Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367.

35.     Venue is proper in the Southern District of New York with regard to Defendant IBM under 28 U.S.C. §1391 because IBM has its headquarters in Armonk, Westchester County, New York.

**36.**     Venue is proper in the Southern District of New York with regard to Defendant Kyndryl under 28 U.S.C. § 1391 because Kyndryl has its headquarters in New York, New York.

## IV.    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

37.     All Plaintiffs timely filed a Charge of Discrimination with the EEOC and equivalent state agencies alleging age discrimination within the requisite statutory period. Such filings occurred within 180 days of the unlawful employment practices alleged in this Complaint. More than 60 days have passed since the filing of these charges.

V.    **FACTS**

38.    The circumstances surrounding how these Plaintiffs, Michael Nolan, Karla Bousquet, Jay Zeltzer, Teresa Cook and Randall Blanchard's suffered an adverse employment action from either IBM or Kyndryl are unique. But all of them suffered these adverse employment actions as a direct result of IBM's ageist scheme described *supra*—which was adopted and continued by Kyndryl after it was spun-off in 2021. Nevertheless, the common patterns and tactics of discriminatory behavior deployed by these two giant corporations to illegally target older workers, sadly, are not unique.

39.    Those tactics detailed *infra* by the Plaintiffs include being selected for termination, without any grounding in performance or merit-based reality, pre-selected for termination by someone or some *thing* other than their manager, being replaced by younger, less qualified employees and being told, directly and indirectly, that the companies were focused on a younger workforce. Similarly situated plaintiffs in other lawsuits have repeatedly told the same stories, supported by documentary evidence. Each these Plaintiffs' unique facts are as follows.

**A.  MICHAEL NOLAN**

40.    Michael Nolan dedicated over forty-two years of his life to IBM as a loyal, high-performing employee. IBM hired in 1981 and proceeded to promote him multiple times, assign him to high profile positions. He was awarded twenty-three (23) skills certification badges, and he was consistently paid bonuses to reward his stellar work performance. He was given high marks on annual performance reviews. Nevertheless, his employment was terminated.

41.    In 1990, IBM named him the Assistant to the General Manager for IBM Desktop Software. In 2001, he led the acquisition of the Informix company. In 2013, on his own initiative, he created the company's Product Management Dashboard. In 2018, he was named the Synergy Executive

for the landmark Red Hat acquisition. By the beginning of 2023, Nolan had been an executive for 20+ years, and was the Director of Strategy and Planning where he led strategic planning efforts for the IBM Software Unit.

42.    There, he coordinated the development and review of the annual Strategy deliverables, communicated those strategies and actions to the rest of the company, and was the Software Unit liaison to the corporate staff for their projects.  IBM never once warned or disciplined Nolan for poor performance or otherwise, nor did IBM ever place him on any manner of performance improvement plan in his decades with the company.

43.    IBM crucially relies upon Spring Strategies and Fall Plans to analyze and steer each division of the company from a macro/executive level. Nolan's leadership roles in driving the Spring and Fall Plans for the IBM Software division cannot be overstated. In 2022 alone, Nolan was named as the lead and editor-in-chief for the Software Spring Strategy project; and the co-lead (with Finance), for the Software Fall Plan. He also served in the same year (as in prior years) as the content lead and project manager for the Board of Directors Strategy Review project; the creator, designer, and team manager for the Product Management Dashboard; shadow manager, subject matter expert.

44.    Nolan was also given vital duties for Mergers & Acquisitions projects, Operational Analytics projects, the Corporate Strategy Guild program, the cross-IBM monthly strategy exchange, the EPM project, and the DealSpace project. Amazingly, he also managed to log 47 hours of continuing education time in 2022 through IBM's Think40 program and served as a formal mentor while handling all of these other job duties.

45.    In sum, Michael Nolan was a high caliber employee whose immediate track record should have made it unthinkable to consider him for layoff—much less the alleged elimination of his

absolutely vital job duties for the company.  Nevertheless, IBM ultimately rewarded his four decades of high caliber work performance by (i) discriminating against him based on age and (ii) retaliating against him as a whistle blower by laying him off for  alleged "job elimination" reasons.

46.     For years, Nolan had witnessed firsthand how IBM's new C-suite executives were tearing apart the fabric of the company by laying off older workers *en masse*, many of whom had staffed important leadership roles and had been responsible for advancing IBM's interest for decades all across the company. He watched as talented friends and colleagues were picked off by IBM's ageist layoff schemes. He gained firsthand knowledge of guidance IBM gave to its managers to exclude from layoffs Early Professional Hires—coded language for "young"—and other demographics IBM wanted to see increase within its workforce. Nolan witnessed directives that mandated that employees chosen for layoffs could not be considered for inter-company transfers, and saw IBM HR show extreme preferences for his younger employees over older top contributors in his unit. He also witnessed the forced march of delivering poor performance reviews for any employee HR had secretly "pre-identified" for layoff. Eventually, the ageist executives within the company came for him.

47.     For many years, Nolan directly reported to John Thompson (VP), who reported to Tom Rosamilia (SVP).   In early 2023, Nolan was reassigned to work under Brian Golleme.  Golemme, told him in February of 2023 that he "couldn't do his job without him." IBM executives John Thompson and Tom Rosamilia likewise gave Nolan high marks in his 2022 performance review, which contained no negative feedback whatsoever from any source. Golemme's well-placed reliance on Nolan made it all the more surprising when IBM informed Nolan in March of 2023 that the company would not be giving him the customary raise, equity, or Annual Incentive

Payment bonus for the first time. He asked his direct supervisors why—and he asked to speak with whoever made that decision. IBM never gave him a straight answer.

48.     This coincided generally in time with an incident where his second line manager, Mihir Shah, began referring to him as the company "historian" as commentary on his age and long experience with the company. Shah also began exhibiting a dismissive attitude toward senior staff members and noticeably sidelined Nolan and similarly-aged executives from new projects. The writing was on the wall—Nolan had been targeted for a layoff based on his age—and he proceeded to file a formal internal complaint to blow the whistle about the age discrimination being perpetrated against him and others.

49.     Fifteen days later—and less than two months after his direct supervisor told him he was essentially irreplaceable—IBM responded to his whistle blowing by notifying him that the company was terminating his employment. IBM claimed it was eliminating his position and was thus laying him off as part of one of its infamous Resource Actions. In reality, IBM delegated most of his job duties to Ali Yasin—mid-thirties in age—and tasked Nolan with helping his young replacement learn how to do his job.  In Yasin's own words, he was hired to do things in a "new way."

50.     During the pendency of his layoff, Nolan applied to transfer to a plethora of other positions within IBM so that he could do what he always had intended to do—continue working at IBM as a "lifer" until he was ready to retire. He was not allowed to apply to down-level jobs in the company. HR responded to his protests that the company would not allow Band D executives to be "down-levelled." Most Band D executives are organically within the ADEA-protected class by nature of how much time it historically takes to achieve such a rank. This new anti-down-levelling

policy thus functioned as a thinly-veiled tool to keep older laid-off employees from re-entering the company and thus potentially frustrating IBM's overall goal of achieving a younger workforce.

51.     The job roles Nolan ultimately submitted a transfer request for included, but were not limited to, Strategy Director of Brand, Director of Product Management for Hybrid Data Management, multiple Senior Product Marketer positions, AI Infrastructure Business Development Executive, Business Development Executive for the DoD USAF client account, Quantum Project Manager, Leadership and Change Consultant, Business Development Executive for the Microsoft client account, External Communications & Marketing Leader for Automation, Technical Sales Executive for AI Foundation Models, Service Product Manager, Data Scientist Technical Lead, Business Development Operations Manager, and Treasury Transformation Leader.

52.     Nolan was more than qualified for the positions he sought to transfer into. Cynically, it should be no surprise that IBM rejected every transfer request he submitted. Three of the most likely transfer positions were pulled out from under him in the final days of his employment. One hiring executives had even formally approved him as qualified for one of his applied-to positions before the opportunity was unceremoniously and inexplicably stripped from him by IBM.

53.     IBM's firing of Nolan cost the company a talented, high-performing veteran employee, but it achieved the goal of the ageist scheme. It also amounted to retaliation, because they got rid of an employee who had openly brought attention to illegal practices. IBM's clear efforts to thwart Nolan's attempts to transfer within the company served as yet another example of IBM's commitment to ageism and prove that IBM's "job elimination" explanation was mere pretext for the company's illegal discrimination against Michael Nolan. Accordingly, but for the ageist scheme, Nolan would not have been terminated.

B. **KARLA BOUSQUET.**

54.     Karla Bousquet was employed with IBM for over 26 years. Hired in 1996, she began her career in France. In 1999 she moved to the United States on an international assignment, and permanently relocated in 2004. During her tenure at IBM, she worked in various roles, including as a Public Relations Program Manager, Communications Manager for Network Computing Solutions, Corporate Media Relations Manager, Workforce Diversity Leader, Director of Strategic Programs, Director of Client Executive Marketing, VP of Strategic Events and Global Recognition Experiences, and VP of CEO Events.

55.     Her career at IBM was a success by all objective metrics. She received consistent raises, promotions, and positive performance reviews.  In 2014 she was promoted to a Band C Executive. In that role she worked with the highest-ranking IBM executives.

56.     In 2021, she was nominated by her superiors to join the Page Society's Future Leaders Experience, an elite program for top performing communication specialists. In December 2022 she was given expanded management responsibilities which doubled the number of individuals that reported to her.

57.     Bousquet contributed to many of IBM's most prestigious events including the IBM Centennial THINK Forum, Big Bets, the Word Economic Forum, as well as the Masters and the US Open.

58.     During her time at IBM, she witnessed the company increase its focus on younger workers. Euphemisms like building our "future pipeline" and "revitalizing" the workforce were used to describe what was so clearly obvious. IBM was using executive headcount to focus on hiring and promoting younger employees, many of whom were located outside the US.  She watched as younger, less experienced, and less talented individuals were promoted--while the older, more

experienced, were passed by and fell victim to layoffs. Even as a manager, she was asked not to promote qualified, seasoned, and older employees. Instead, she was instructed to promote their younger colleagues.

59.     Bousquet also witnessed rounds and rounds of layoffs over many years that conspicuously removed the older employees while sparing their younger counterparts. These layoffs would then be accompanied by retitling the jobs so subsequent backfills were harder to detect.

60.     Even during the Covid shutdown, Bousquet delivered an outstanding virtual recognition program for 2000 IBMers and was then asked to create and execute new programs post-Covid, launching IBM Golden Circle and IBM Tech-- massive events intended to recognize IBM's top talent. For her role in developing and putting on these events, Bousquet received praise from the highest levels of the company.  Her manager stated, "[Bousquet] played a key role in designing the recognition strategy for 2022/2023—recently approved by the HR team and the CEO with events (Golden Circle and 2 technical events) for 2023… As everyone notes, [she] is the ultimate collaborator and team player. She plays a key role on our team—and works across all functions and business units to get the job done."

61.     Accordingly, her performance review for 2022 was glowing. Her manager stated that she did not have any areas of improvement for [Bousquet], she praised her "energy and enthusiasm" and stated, "I think she is an incredible leader."

62.     Despite her unparalleled success, in June 2023, she was selected to be laid-off. Ms. Bousquet was told her job functions were being eliminated. That was false. In fact, two people took over her duties.

63.     The lay-off was companywide, and Bousquet observed in her department it only impacted older workers. It was clear none of the younger employees were impacted.

64.    Bousquet was also told that she was not likely to get any other job within IBM. Despite having worn so many hats over the years, she was now unable to fill any other executive role in the company. It was clear what was happening. She was being pushed out to make room for younger employees.

65.    Consistent with what she witnessed so many times in the past at IBM, the lay-off that impacted her disproportionately removed the older employees. As always happened, it was then followed by a reorganization that muddled the water of who was backfilling the vacated roles, including Bousquet's.  However, through the thinly veiled cover it is clear that older employees were pushed out by the lay-off and now the business group she once led is now managed by a much younger senior executive. Accordingly, but for the ageist scheme, Bousquet would not have been terminated.

### C.  Jay Zeltzer

66.    Jay Zeltzer's illustrious career with IBM spanned over twenty-five (25) years. Hired in 1995 and then re-hired in 2000, Mr. Zeltzer's spent his career at IBM in high-level sales roles where he worked with IBM's top clients and generated business and revenue critical to the success of IBM.

67.    During his tenure, Mr. Zeltzer had a proven track record of success. He was a highly regarded IBM sales leader who received eight (8) promotions, forty-three (43) eminence/monetary awards, and even reached IBM's highest non-executive job level—Band 10—where he remained for six years. Mr. Zeltzer also received consistent positive performance reviews throughout his career at IBM. In 2021, his supervisor even noted that "[Zeltzer's] tenure at IBM helps him navigate the organization with expediency and efficiently; and in 2022 his manager noted "Jay, you have skills and experience that are valuable."

68.     At the height of Mr. Zeltzer's IBM employment, he was responsible for a portfolio used by 7,500 clients, which generated $900 million annually for IBM. Mr. Zeltzer was frequently tasked with representing IBM at industry events both internationally and domestically, and IBM relied on Mr. Zeltzer to train and equip IBM sales teams with strategic resources, content, and guidance to successfully drive sales and generate revenue.

69.     One example of Zeltzer's many successes occurred at the end of 2021 when he was instrumental in obtaining the business of General Motors Finance for one of the largest document migration projects in IBM history. The leadership at General Motors considered Zeltzer critical to the success of this project and requested he remain on the account.

70.     After years of success and merit-based promotions, Zeltzer began to notice a concerning and discriminatory practice take root at IBM—the promotion and elevation of younger workers over more seasoned and qualified employees. He watched as IBM demoted successful senior sellers to roles that had minimal impact on the overall success of IBM.

71.     Unfortunately, this discriminatory practice came for Mr. Zeltzer in 2022 when IBM intentionally changed the playing field to ensure his failure. Despite his countless successes—his hugely profitable 2021 and 2022 and having never received a negative performance review—Mr. Zeltzer was suddenly and mandatorily demoted to Band 9 in the first quarter of 2022. He was subsequently and transferred to a new position covering smaller sales territories. IBM simultaneously brought in two younger new hires to work alongside Zeltzer—Anthony Fratantoni (35 years old) and Jessica Thompson (29 years old).    In this demoted position, Zeltzer was expected to maintain the same quota he had with his prior, larger sales territory, and he was to train the new young hires. Unbeknownst to Zeltzer, he was training his younger replacements.

72.     Zeltzer's attempts to transfer internally to positions he was well qualified for were also blocked despite other IBM managers desiring his placement within their group and despite clients such as General Motors Finance "respectfully begging you [IBM] to assist us and do whatever is necessary to ensure Jay Zeltzer remains with GM Financial. . .". IBM disregarded this client's sincere request, and nevertheless put Zelter in a demoted role that was destined to fail.

73.     Zeltzer's IBM tenure was abruptly cut short when he was baselessly placed on a performance improvement plan, terminated, and given a nonsensical explanation for why his successful job performance history at IBM was deficient. In 2023, he was put on a Formal Performance Improvement Plan ("PIP"). The PIP program was utilized by IBM not for "performance improvement" but as a cover for their scheme to make IBM's workforce younger by terminating older workers. It was effectively a formality for IBM to end Zeltzer's successful career. By being placed in the PIP program, Mr. Zeltzer was further blocked for eligibility for internal transfer within IBM despite being eminently qualified for another position.  Despite making every effort to succeed in a demoted position destined for failure, on August 15, 2023, Mr. Zeltzer, at the age of fifty-seven, was forced to retire from IBM—a constructive termination that would not have occurred but for the ageist scheme.

### D.  TERESA COOK

74.     Teresa Cook was employed with IBM for over 27 years before she was abruptly terminated. She began her career in London, England on an international assignment, which IBM renewed multiple times, before asking her to permanently relocate to the United States in 1999. During her tenure at the company, she received numerous awards and promotions, swiftly advancing from various Manager positions to Director roles. Then she advanced to being a Vice-President of IBM Global Technology Services Product Marketing—a Band C Executive Position. In 2019, she was

promoted to Chief Marketing Officer (CMO) of IBM's Industry Platforms Business Unit. In her role as CMO, she oversaw all marketing for the business unit and worked with IBM's highest-ranking executives. As CMO, Cook implemented an account-based marketing program focused on the top 100 IBM accounts, which resulted in incremental revenue growth in the majority of accounts.

75.     Cook's career at IBM was incredibly successful. She received numerous promotions, raises, performance bonuses, awards, and consistent high-performance reviews. Cook was sponsored by IBM to attend and complete the Chief Marketing Officer Program at the prestigious Northwestern University Kellogg School of Management. She also published widely circulated articles on various marketing topics. Cook was consistently selected to represent IBM at national conferences, including the I.T. Marketing Service Organization (ITSMA) Leadership Summit—a globally renowned conference attended by many of the brightest marketing minds in the technology industry.

76.     After a successful twenty-four years in IBM Marketing, she was asked to take over a role in IBM Technology and Sales—where she successfully led and managed the Integrated Account MD Program, one of IBM's coveted Top 100, $100 million accounts.

77.     Given Cook's track record of developing high performing, cohesive teams, she was tasked in 2022 with implementing and spearheading a new program coined the "Executive Advocate Program," which her direct manager described as "a significant cultural shift by our senior leaders across IBM's most important technology and transformation accounts". The program was wildly successful and drove over 10% of incremental revenue for IBM. In her performance review, Cook's direct manager commended her for smoothly executing such a complex program launch.

78.     In fact, the program was such a success that Cook was selected for another strategic assignment in July 2022 and asked to take on even more responsibilities, establishing and leading a brand-new mission branded IBM TechXChange, which she successfully developed, and prepared for launch in November 2022. In her performance review, her manager applauded Cook's development of the program, deeming it a success and commented that "Teresa's strengths in the ongoing coaching of the team" led to its success.

79.     Despite her continued demonstrable success, Cook was continuously reminded by HR in the months leading up to her termination of her eligibility for IBM's voluntary retirement plan. She was even asked, more than once, if she planned on retiring. Cook, who was consistently being promoted within IBM and selected for more expansive roles, advised IBM that she had no desire or intention to retire. This pushing of older workers towards an unsolicited, and unwanted retirement is directly out of the IBM playbook of past and present discriminatory schemes described in more detail above.

80.     Right on cue, in December 2022, after successfully developing TechXChange and leading the Executive Advocate Program, Cook was informed that her position was being eliminated and that she needed to look for another role. When she asked for an explanation, HR told her the job elimination was due to "politics," and had nothing to do with her performance. Being selected for termination without any direct connection to her job performance, but rather ambiguous explanations from HR staff that were not in Ms. Cook's direct management chain, is another in a long list of IBM tactics when targeting older workers for termination. Cook was subsequently advised that her manager's role was also being eliminated. Having significant experience, demonstrated skill, and seniority at IBM, Cook requested to be interviewed for her manager's revised role. She was repeatedly denied the opportunity without explanation.

81.     Upon further investigation, Cook discovered that she and her manager's roles were not being eliminated, but rather re-organized, re-branded, and given to a younger employee with significantly less experience, skill, and tenure at IBM. Once again, the re-branding of roles, which are effectively a distinction without a difference, is consistent with IBM's discriminatory schemes designed to replace older, more experienced employees with younger, less experienced workers.

82.     Cook ultimately filed an internal complaint at IBM, known internally as the Open-Door Process, complaining that she was being discriminated against based on her age. A mere month later, she was selected to be laid-off as part of an infamous Resource Action. Despite IBM touting the Open Door process as an independent, unbiased review of employee concerns, Cook's very serious allegations of management discrimination were responded to by telling her to discuss with her manager, an incredible violation of the spirit, and letter, of the Open Door process's stated goal of independence and confidentially. The substance of Cook's allegations went un-answered.

83.     During her remaining time at IBM—when she wasn't helping train her younger replacement—Cook actively pursued her internal IBM network for a position but was consistently denied job opportunities without explanation. She was ultimately informed by HR that no job openings would be available until, coincidentally, after her separation date. It was clear that she was being pushed out permanently and IBM had no intention of placing her in a new role—because of her age.

84.     Consistent with many other Plaintiffs' experiences at IBM, Cook was replaced by a younger, less experienced, employee under the guise of a "reorganization," a tactic employed by IBM to attempt to muddy the waters as to who was backfilling the vacated roles. Accordingly, but for the ageist scheme, Cook would not have been terminated.

E.  RANDALL BLANCHARD

85.     Randall "Randy" Blanchard began his career with IBM in 1988. He started at the bottom and in the following 35 years successfully worked his way into a top Band 10 sales position. Inside IBM and Kyndryl, Band 10 positions are the highest non-Executive positions. Such positions are attained by a very small percentage of highly trained, highly regarded, and highly successful professionals.

86.     In 2021, portions of IBM were "spun off" into Kyndryl. As stated *supra*, Kyndryl was created from the spin-off of IBM's infrastructure services business and comprised the bulk of the former IBM Global Technology Services (GTS) group—along with portions of other sales and back-office support functions and personnel. Blanchard voluntarily transitioned to Kyndryl in September 2021. In May 2023, some twenty months later, his employment as a Sales Partner was terminated.

87.     Blanchard's legacy at IBM, which continued with Kyndryl, was one of excellence. He had positive performance reviews, promotions, awards, and earned bonuses. This sustained excellence was rewarded with numerous "100% Club" and "Golden Circle" awards for sales performance. For over 20 years, Blanchard specialized in developing customer relationships and being an expert on the technical needs of financial services industry—which were clients whose needs were met by Blanchard at IBM and then later Kyndryl.  Just a short time before being terminated, Blanchard had the title of Director Sales Partner, and he was instrumental in obtaining a $9.8 million agreement with Regions Bank.  His 2022 work alone at Kyndryl was at 394 % of his sales quota which earned him a six-figure bonus.  Upon his termination at Kyndryl, it was acknowledged that he was probably responsible for over $1 billion dollars of revenue for the work he performed for IBM and Kyndryl combined.

88.    When Blanchard was given notice of his termination at Kyndryl by his immediate first-line manager—Blanchard inquired about how and why he was chosen. Blanchard was advised by his first-line manager that his termination was not based on his skills and that HR had sent the names of those to be terminated to his manager. Notably, Mr. Blanchard's first line manager admitted that he did not participate in the selection of Mr. Blanchard for termination. The selection of individuals for termination by someone other than their direct manager, who is in the best position to understand their performance and capabilities, comes right out of the IBM discriminatory playbook.

89.    In response to Blanchard's EEOC complaint, Kyndryl stated Blanchard was not terminated because of his age but because Kyndryl eliminated the entire role of a Sales Partner in the company. In particular, Kyndryl asserted that "instead of Sales Partners it needed the new role of Account Partner, where the focus was on the ability to maintain and develop client relationships, which was viewed as one of the most important qualities for the new role. And unlike the Sales Partner role, the Account Partner served as the overall lead on an account, meaning the Account Partner owned the customer relationship and served as the subject matter expert on their business."  Kyndryl also asserted that "Mr. Blanchard was simply not the most qualified candidate for an Account Partner role, given his lack of key client relationships. "

90.    To the contrary, Kyndryl did not eliminate Blanchard's job—they merely changed the title of the job by substituting the word Account for the word Sales. The description they offered for the new role of Account Partner versus the old role of Sales Partner is a distinction without a difference. Kyndryl's basis for its conclusion that Mr. Blanchard was not qualified to be an Account Partner "given his lack of key client relationships" is simply untethered from reality.

91.     Blanchard was not terminated for performance. His sales performance over many years far exceeded what was required. Blanchard was not terminated because he lacked key qualifications for either the Sales Partner role, or the re-branded Account Partner role. Many years of performance reviews as well as management, peer, and client feedback belie that position.

92.     Instead, Blanchard was terminated by Kyndryl because he fell victim to the illegal ageist scheme created by IBM and adopted and continued by Kyndryl. This discriminatory scheme was previously created by IBM's highest executives—many of whom now populate the leadership ranks of Kyndryl. Accordingly, but for the ageist scheme, Blanchard would not have been terminated.

## VI.     <u>CAUSES OF ACTION</u>

### A.  <u>CLAIMS AGAINST DEFENDANT IBM</u>

**Count 1: Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et. seq.* ("ADEA") On Behalf of Plaintiffs Nolan, Bousquet, Zeltzer, and Cook.**

93.     Plaintiffs incorporate by reference all allegations in this Complaint.

94.     IBM terminated or constructively terminated Plaintiffs because of their age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1).

95.     IBM's violation of the ADEA was knowing and willful.

96.     As a direct and proximate result of IBM's age discrimination, Plaintiffs have lost their jobs and sustained and will continue to sustain wage and benefit losses and have incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

97.     As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiffs have lost earnings capacity.

**Count 2: Retaliation under Title VII, 42 U.S.C. § 2000e-(3)(a) ("Title VII") On Behalf of Plaintiffs Nolan and Cook.**

98.     Plaintiffs Nolan and Cook incorporate by reference all allegations in this Complaint.

99.     IBM retaliated against Plaintiffs Nolan and Cook for opposing IBM's unlawful employment practice of discriminating on the basis of age, by terminating them from their employment and preventing them from obtaining other employment at IBM in violation of 42 U.S.C. §2000e-(3)(a).

100.    IBM's violation of Title VII was knowing and willful.

101.    As a direct and proximate result of IBM's age discrimination, Plaintiffs Nolan and Cook lost their jobs and sustained and will continue to sustain wage and benefit losses and have incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

102.    As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiffs Nolan and Cook have lost earnings capacity.

**Count 3: Wrongful Termination in violation of Public Policy Against Age Discrimination, Virginia Human Rights Act, Va. Code §§ 2.2-3900, *et seq*. ("VHRA") On Behalf of Plaintiff Nolan.**

103.    Plaintiff Nolan incorporates by reference all allegations in this Complaint.

104.    IBM terminated Plaintiff Nolan because of his age in violation of the Virginia Human Rights Act, Va. Code. §§ 2.2-3900.

105.    IBM's violation was knowing and willful.

106.    As a direct and proximate result of IBM's age discrimination, Plaintiff Nolan lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

107.    As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff Nolan has lost earning capacity.

**Count 4: Discharging Individual For Discrimination based on Age, District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq*. On Behalf of Plaintiff Bousquet**

108.    Plaintiff Bousquet incorporates by reference all allegations in this Complaint.

109.    IBM terminated Plaintiff Bousquet because of her age in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq*.

110.    IBM's violation was knowing and willful.

111.     As a direct and proximate result of IBM's age discrimination, Plaintiff Bousquet lost her job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

112.    As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff Bousquet has lost earning capacity.

**Count 5: Age Discrimination Under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. Ann. § 56a-60(a)(1). On Behalf of Plaintiff Cook.**

113.    Plaintiff Cook incorporates by reference all allegations in this Complaint.

114.    IBM terminated and retaliated against Plaintiff Cook because of her age, and because she opposed unlawful age discrimination at IBM, in violation of Conn. Gen. Stat. Ann. § 56a-60(a)(1) *et seq*.

115.    IBM's violation was knowing and willful.

116.    As a direct and proximate result of IBM's age discrimination, Plaintiff Cook lost her job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

**Count 6: New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq*. (On Behalf of Plaintiff Zeltzer).**

117.    Plaintiff Zeltzer incorporates by reference all allegations in this Complaint.

118.   IBM terminated Plaintiff Zeltzer in violation of New York State Human Rights law prohibiting discrimination on the basis of age.

119.   IBM's violation was knowing and willful.

120.   As a direct and proximate result of IBM's age discrimination, Plaintiff Cook lost her job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

**B.   CLAIMS AGAINST DEFENDANT KYNDRYL**

> **Count 1: Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et. seq.* ("ADEA") On Behalf of Plaintiff Blanchard.**

121.   Plaintiff Blanchard incorporates by reference all allegations in this Complaint.

122.   Kyndryl terminated or constructively terminated Plaintiff Blanchard because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1).

123.   Kyndryl's violation of the ADEA was knowing and willful.

124.   As a direct and proximate result of Kyndryl's age discrimination, Plaintiff Blanchard has lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

125.   As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff Blanchard has lost earnings capacity.

> **Count 2: Alabama Age Discrimination in Employment Act, Ala.Code § 25-1-21. On Behalf of Plaintiff Blanchard.**

126.   Plaintiff Blanchard incorporates by reference all allegations in this Complaint.

127.   Kyndryl terminated Plaintiff Blanchard in violation of the Alabama Age Discrimination in Employment Act.

128.   Kyndryl's violation was knowing and willful.

129.     As a direct and proximate result of Kyndryl's age discrimination, Plaintiff Blanchard lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

## VII.  **JURY DEMAND**

130.     Plaintiffs request a trial by jury on all claims against all Defendants.


## VIII.  **DAMAGES**

131.     WHEREFORE: Plaintiffs Nolan, Bousquet, Zeltzer and Cook requests the Court enter judgment and relief as follows:

1)   That IBM be ordered to pay these Plaintiffs back pay and benefits with interest;

2)   That a final judgment in favor of these Plaintiffs against IBM be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiffs;

3)   That IBM be ordered to reinstate Plaintiffs to their respective former positions with all lost pay and benefits, seniority and promotions;

4)   That in the alternative to reinstatement, IBM be required to pay these Plaintiffs front pay and benefits in the event reinstatement is not feasible;

5)   Penalties available under applicable laws;

6)   Costs of this action incurred herein, including expert fees;

7)   Attorneys' fees;

8)   Pre-judgment and post judgment interest, as provided by law, and

9)   Such other and further legal and equitable relief as this Court may deem just and proper.

132.     WHEREFORE: Plaintiff Blanchard requests the Court to enter judgment and relief as follows:

1) That Kyndryl be ordered to pay Plaintiff Blanchard back pay and benefits with interest;

2) That a final judgment in favor of Plaintiff Blanchard against Kyndryl be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiff Blanchard;

3) That Kyndryl be ordered to reinstate Plaintiff Blanchard to his respective former position with all lost pay and benefits, seniority and promotions;

4) That in the alternative to reinstatement, Kyndryl be required to pay Plaintiff Blanchard front pay and benefits in the event reinstatement is not feasible;

5) Penalties available under applicable laws;

6) Costs of this action incurred herein, including expert fees;

7) Attorneys' fees;

8) Pre-judgment and post judgment interest, as provided by law, and

9) Such other and further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
512/476-4600
512/476-5382 (Fax)

By:_____
    Heidi A. Coughlin
    State Bar No. 24059615
    hcoughlin@w-g.com
    Brantley Ross Pringle, Jr.
    State Bar No. 16330001
    rpringle@w-g.com