## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL NOLAN, KARLA BOUSQUET,
JAY ZELTZER, and TERESA COOK,

*Plaintiffs*,

v.                                                          Case no.: 7:24-cv-4653

INTERNATIONAL BUSINESS MACHINES
CORPORATION

*Defendant*.

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Michael Nolan, Karla Bousquet, Jay Zeltzer, and Teresa Cook bring this action

against International Business Machines Corporation ("IBM") under the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621 – 634 ("ADEA"). Plaintiffs allege as follows:

## I.    STATEMENT OF THE ACTION

### A.  INTRODUCTION

1.      Plaintiffs' celebrated tech careers were each cut short by an ageist scheme created and

executed by IBM executives.

2.      The scheme—which is in effect a discriminatory corporate transformation plan aimed at

reducing company-wide employee age—has been the subject of numerous age discrimination

lawsuits.[1] ProPublica extensively investigated and documented IBM's nefarious multi-year plan

to target and replace older workers in 2018.[2] The U.S. Equal Employment Opportunity

---

[1] The illegal scheme of IBM is further corroborated by the Exhibits attached to the Amended
Complaint in *Townsley v. IBM*, Case 1:20-cv-00969-LY ECF. 5 (Filed 10/07/20).
[2] Peter Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of
Discrimination at IBM*, PROPUBLICA, (Sept. 11, 2020), available at

Commission ("EEOC") conducted an independent and thorough investigation and determined that over a period of several years IBM's "highest-ranks" engaged in "top-down messaging" that "directed its managers to engage in an aggressive approach to **significantly reduce the headcount of older workers to make room for EPH**."[3] In this context, "EPH", or Early Professional Hire, is an IBM-created classification for young professionals very early in their career stage that are almost always decades younger than their laid-off counterparts they were intended to replace *en masse*.

3.      The EEOC also found **evidence of a discriminatory animus at the IBM leadership level**, where for years the rolling layoffs had disproportionately impacted older workers (85.85%). The EEOC ultimately concluded that IBM's defense to the age discrimination claims, "[did] not withstand scrutiny," and there exists "reasonable cause to believe" older employees were "discriminated against…on account of their age."[4] The same scheme that was exposed by ProPublica and then formally corroborated by the EEOC is still *alive and well* at IBM today. The Plaintiffs herein are merely some of the latest victims of another iteration of the continued scheme.

## B.  THE SCHEME

4.      Beginning several years ago, the executive leadership of IBM began to use a series of company-wide methods to target and eliminate older workers while contemporaneously hiring younger employees, both domestically and abroad and exempting those younger workers from the

---

https://www.propublica.org/article/the-u-s-equal-employment-opportunity-commission-confirms-a-pattern-of-age-discrimination-at-ibm.

[3] **Ex. 1**, IBM Corporation's U.S. EEOC Determination, pgs. 1-2 (September 3, 2020) (emphasis added).

[4] *Id.* ("The Commission's investigation reveals that Respondent conducted Resource Actions analyzed by the EEOC between 2013 and 2018 that had an adverse impact on employees in the protected age group (PAG). The investigation uncovered top-down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires.").

ongoing rolling layoffs. A cadre of top IBM executives developed the plan that includes weaponizing artificial intelligence and scoring algorithms against older workers by using age-correlated selection criteria, as well as biased predictive analytics. Human Resources ("HR") implemented the plan by using the unfairly-weighted criteria and analytics to pre-select employees for layoff without even consulting first line managers. Finance made the math work and provided the business case for mass exits of older employees. Cognizant that its efforts to "revitalize" its workforce violated anti age-discrimination laws, Legal devoted significant time and resources to devising tactics and procedures to avoid detection and create plausible deniability.

5.      Veiled corporate language—crafted and employed by the highest-level executives—served to obscure that actions were being taken designed to fire the old to make way for the young. Executive planning documents are replete with terms such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation"—catchy coded corporate language that permitted executives to speak about illegal discrimination in a way that avoided detection, gave cover, and provided plausible deniability.

6.      To execute the scheme, IBM executives mandated companywide rolling layoffs. Notably, IBM labelled these layoffs as "Resource Actions," a unique nomenclature for layoffs specific to IBM. The "Resource Actions" or "RAs" were implemented companywide—but were purposefully broken up into smaller sub-groups to better shroud its discriminatory animus in secrecy. These mass RAs were given secret code names and coordinated scheduling across multiple business groups.

7.       From the high echelons of IBM, orders were given to front line managers to create impossible-to-meet performance goals for older workers. Failure to achieve the impossible was

then used by IBM to create baseless negative performance reviews to justify subsequent terminations. IBM also employed techniques to artificially reduce employees' favorable performance review scores—which gave further false pretense for terminations.

8.    Evidence exists that the HR department and executives several levels up from an employee's first-line manager placed employees on secret internal RA lists that marked them for termination—long before first-line managers even knew that their subordinate had been pre-selected for termination. IBM would then use first-line managers as unwitting "cat's paws" for the discriminatory termination pre-approved by HR. HR would then obfuscate this termination decision to make it seem like it was actually the first-line manager's decision to terminate that employee.

9.    In *Langley v. IBM*, a Federal Court in Texas analyzed this exact issue, and ruled that "internal IBM corporate planning documents" provided cause for the Court to determine that a fact question existed as to whether "IBM executives sought to lay off older workers in an effort to hire a younger workforce."[5] The Court additionally determined that evidence existed that IBM's hire-and-fire scheme effectively told first-line managers who to lay off, and then used them to further conceal IBM's top-down ageist animus.[6] The Southern District of New York has also considered similar documents—and declared that they would be "directly relevant" to the same ADEA claims

---

[5] *Langley v. Int'l Bus. Machines Corp.*, No. 1:18-CV-443-DAE, 2020 WL 8052973, at *4 (W.D. Tex. 2020) ("In this case, the evidence creates a factual issue as to whether [the first-line manager] was in fact effectively told whom to lay off, as well as whether her and her supervisors' attempts to place [the employee] in different positions were overruled by HR and IBM executives.").
[6] *Id.*

made here and would "on their face appear to show an effort to remove older employees in favor of younger employees."[7]

10.    While actively firing effectively *thousands* of its older workers, IBM was simultaneously busy hiring young employees *en masse* to replace the laid-off older workers. To hide the replacement, IBM would frequently create different job titles and shift organizational structures to make it harder to detect that IBM had not eliminated a position, but instead merely replaced older workers with younger workers. To ensure that the Resource Actions did not accidently target coveted young Early Professional Hires, IBM skewed the pool of people who could be targeted for layoffs by creating policies that unilaterally excluded younger employees—notwithstanding their job performance—from the rolling layoffs.

11.    IBM also employed complex and byzantine procedures to prevent the targeted older employees from finding new jobs at IBM for which they were qualified. This included policies that prohibited laid-off executives from transitioning into new internal roles or new jobs at a lower level. There were also policies that reclassified fired older employees at IBM as retirements or performance-based terminations.

---

[7] *Lohnn v. Int'l Bus. Machines Corp.,* No. 21-CV-6379 (LJL), 2022 WL 364320, at *12, *6 (S.D.NY. Jan 4, 2022), appeal withdrawn, No. 22-32, 2022 WL 182320899 (2d Cir. July 25, 2022).

## C. IBM'S EXECUTIVE STATEMENTS, CONDUCT, RECRUITING MATERIALS, AND PUBLICATIONS CONTINUE TO REFLECT AGE ANIMUS.

12.     In the recent past, IBM's leadership embarked on a massive "reinvention" and rebranding campaign aimed at attracting EPH workers. These younger employees are viewed by IBM as key to the company based on discriminatory stereotypes against older workers. For example, IBM's highest executives have displayed discriminatory animus to support the reinvention campaign—including expressing the belief that older workers constitute a poor return on investment because they lack the ability to learn new skills, to embrace changing technology, or to collaborate with their colleagues. IBM recently corroborated the existence of its ongoing efforts to "***bring in as much young talent into the workforce,***"[8] while still continuing its rolling layoffs that target older employees.

13.     Current marketing materials from IBM not-so-subtly highlight the young age demographics sought by the company:



---

[8]  Shivani Shinde Nadhe, *IBM's new team to focus on millennials*, BUSINESS STANDARD (May 31, 2024), available at https://www.business-standard.com/article/companies/ibm-s-new-team-to-focus-on-millennials-116053000677_1.html (emphasis added).





14.     The discriminatory animus of IBM executives is likewise well documented, and it drives the strategy for eliminating older workers. According to IBM's own recent internal tracking, the average age of employees at IBM in total was around 39 years old. Despite that relatively young average age, the tracking set off a focused effort by IBM's senior executives to reduce the average age and increase the percentage of the workforce in the coveted Millennial and Gen Z cohorts.

15.     Over the ensuing years, the focus, tracking, and reporting on age at IBM was relentless at the executive level. The average age of the workforce was consistently updated to the C-Suite, who then reported those stats in updates to the Board of Directors. The RAs that followed carried out IBM's will to make itself younger.

16.     Data confirms that older workers have been disproportionately targeted for termination in these ongoing RAs. From 2017 to 2020, the average age of employees selected for termination was all over 50 years of age. Publicly available data during those time frames indicate the average age of IBM's total workforce was around 38 years of age.

17.     Prominent media outlets have corroborated the existence of these discriminatory RAs and the animus that motivated them. For example, in 2022 the New York Times reported that IBM

"executives discussed in emails how to force out older workers and derided them as 'dino babies' who should be made an 'extinct species.'"[9]

18.    In one internal IBM publication, "Myths, exaggerations and uncomfortable truths – The real story behind Millennials in the workplace," the company flattered the Millennial generation it sought to recruit.[10] Simultaneously, the company disparaged older Gen X and Baby Boomer employees in another publication.[11] In the investigating reporting article, "Cutting Old Heads at IBM," an IBM consulting services paper titled "The Maturing Workforce" referred to older workers as "gray hairs" and "old heads."[12] Years later, IBM publicly doubled down on these stereotypes, characterizing older employees as suffering from workplace "dysfunctions."[13] The same IBM paper alleged that "older employees" were allegedly less trusting of their co-workers, less collaborative, less committed, less accountable, and less attentive to results.[14] It also stated that Baby Boomers—when compared to other generations of employees—were the least likely to understand IBM's business strategy, least likely to understand their manager's expectations of

---

[9] Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force,* THE NEW YORK TIMES (February 12, 2022), available at
https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html; *see also* Jack Kelly, *IBM Accused of Ageism: Older Workers are 'Dinobabies' Who Should be Made an Extinct Species,* FORBES (February 12, 2022), available at
https://www.forbes.com/sites/jackkelly/2022/02/12/ibm-accused-of-ageism-older-workers-are-dinobabies-who-should-be-made-an-extinct- species/.
[10] Mark Eltringham, *Myths and Uncomfortable Truths*, WORK PLACE INSIGHT (Feb. 27, 2015) https://workplaceinsight.net/ibm-exposes-myths-exaggerations-and-uncomfortable-truths-about-generation-y/.
[11] Peter Gosselin, *Cutting 'Old Heads' at IBM*, PROPUBLICA (March 22, 2018), available at, https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.
[12] *See id.*
[13] Managing Millennials: 5 Common Issues Leaders Face (August 24, 2016). (The original content has been removed).
[14] *Id.*

---

them, least likely to understand what customers wanted, and the least likely to understand IBM's brand.[15]

19.     The evidence corroborates that the scheme has continued for years without a hitch. Shortly after a recent round of IBM layoffs targeting its most loyal, longtime employees, the company published an article aimed at "get[ting] the Gen Z generation excited about good-paying jobs" at IBM.[16]

### E. **IBM's Scheme Continues to this Day.**

20.     Far from being over, IBM continues its ageist scheme to rid itself of its older workers. As discussed *supra*, in a nearly identical lawsuit against IBM based on age discrimination, a current IBM executive attested that discriminatory IBM executive level planning documents were still relevant to IBM's current business practices. To wit, on August 27, 2021, it was attested that "even though some of the documents are five to six years old, they provide insight into IBM's decision-making processes that are still being used today," and that the documents contained "IBM's **current** thinking and decision-making process" and that "IBM continues to hire along similar tracks today."[17]

21.     In 2022, and despite announcing that no more major layoffs would occur, CEO Arvind Krishna approved in 2023 the termination of thousands of older employees through the tried and true, "fire-and hire" Resource Action scheme. A recently leaked video of Krishna confirms that IBM has continued its practice of using secretive top-down pressure to gerrymander its workforce

---

[15] *Id.*

[16] IBM Z for Gen Z Part 1 March 22, 2024, https://community.ibm.com/community/user/ibmz-and-linuxone/blogs/sandeep-batta/2024/03/22/ibm-z-for-gen-z-part1?communityKey=b8b88f20-24c8-49f0-9021-4a8c6247a067.

[17] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2 (emphasis added).

to reflect the demographic preferences of its Executives.[18] In this video, the CEO told employees that if they do not hire the desired race of an employee, he will ensure they will lose their bonuses.

22.      In another recently filed age discrimination lawsuit, *Wimbish v. IBM*, it was made clear that even HR mangers know the scheme is continuing. In their complaint, these fired HR managers alleged that IBM's HR still constantly consider an employee's "runway" when determining if that worker would be terminated. "Runway" is coded language for how long IBM HR expects an employee to remain at IBM before they retire—a direct proxy for age.[19]

23.      The *Wimbish* plaintiffs also stated that they were deeply familiar with IBM's recent and continued obsession with age during mass layoffs. These former HR managers allege that decision makers at IBM were constantly referring to a need for employees with "new skills" or "new energy"—more coded language for younger workers.[20] One *Wimbish* plaintiff even received a list of the people slated for termination, including their respective ages. This list of "IBM's best and brightest among the HR organization . . . were also some of the Company's older and most senior HR partners."[21] Court documents and all available evidence accordingly reveal that the ageist and illegal scheme is alive and well, and that these Plaintiffs are simply some of the latest to fall victim to it.

---

[18] Okeefe Media Group, *Leaked IBM Video*, INSTAGRAM, (December 11, 2023), available at https://www.instagram.com/okeefemedia/reel/C0u7vvDMypu/.
[19] *See* Orig. Compl., *Wimbish v.. Int'l Bus. Machines Corp*., 1:23-cv-08327, Sept. 20, 2023, (SDNY) ECF No. 1, at 1 – 2 (emphasis added).
[20] *Id*. at ¶ 37 – 38.
[21] *Id*. at ¶ 45.

## II.    PARTIES

24.    Plaintiff Michael Nolan is a citizen of the United States and is a resident of Virginia. He timely filed a charge of age discrimination with the EEOC after he was terminated at age sixty-three (63) as a direct result of IBM's ageist scheme to fire its older workers.[22]

25.    Plaintiff Karla Bousquet is a citizen of the United States and is a resident of Washington D.C. She timely filed a charge of age discrimination with the EEOC after she was terminated at age fifty-two (52) as a direct result of IBM's ageist scheme to fire its older workers.[23]

26.    Plaintiff Jay Zeltzer is a citizen of the United States and is a resident of New York. He timely filed a charge of age discrimination with the EEOC after he was terminated at age fifty-seven (57) as a direct result of IBM's ageist scheme to fire its older workers.[24]

27.    Plaintiff Teresa Cook is a citizen of the United States and a is a resident of Connecticut. She timely filed a charge of age discrimination with the EEOC after she was terminated at age fifty-five (55) as a direct result of IBM's ageist scheme to fire its older workers.[25]

28.    All Plaintiffs herein were in the protected group at the time of the adverse employment action. All Plaintiffs herein were entitled to protection consistent with the goals promulgated by the ADEA.[26] All Plaintiffs herein were discriminated against through this illegal scheme that resulted in an adverse employment action due to their age. They now bring this case to vindicate their rights under the ADEA and various State laws.[27]

---

[22] *See* **Ex. 3**, *Nolan EEOC Charge*, **pgs. 1 – 7**.
[23] *See* **Ex. 4**, *Bousquet EEOC Charge*, **pg. 1 – 6**.
[24] *See* **Ex. 5**, *Zeltzer EEOC Charge*, **pg. 1 – 7**.
[25] *See* **Ex. 6**, *Cook EEOC Charge*, **pg. 1 – 6**.
[26] **Ex. 2**, "The State of Age Discrimination and Older Workers in the U.S. 50 Years After the Age Discrimination in Employment Act (ADEA)" by Victoria A. Lipnic, Acting Chair of the U.S. Equal Employment Opportunity Commission.
[27] *Id.*

29.     Defendant IBM is a New York corporation with its principal place of business in Armonk, New York. IBM is a technology company that provides both equipment and services in the fields of computer hardware, computer software, cloud computing, data analytics and artificial intelligence. IBM is a Fortune 500 company that employs hundreds of thousands of people.

### III.     JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over Plaintiffs' claims under 29 U.S.C. 626 (b), which authorizes federal jurisdiction over any action to enforce the ADEA. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343 because each Plaintiff is a natural person seeking redress for Defendants' violations of their civil rights under the ADEA.

31.     This Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367.

32.     Venue is proper in the Southern District of New York with regard to Defendant IBM under 28 U.S.C. §1391 because IBM has its headquarters in Armonk, Westchester County, New York.

### IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

33.     All Plaintiffs timely filed a Charge of Discrimination with the EEOC and equivalent state agencies alleging age discrimination within the requisite statutory period. Such filings occurred within 180 days of the unlawful employment practices alleged in this Complaint. More than 60 days have passed since the filing of these charges.

### V.     FACTS

34.     Plaintiffs, Michael Nolan, Karla Bousquet, Jay Zeltzer, and Teresa Cook suffered adverse employment actions from IBM. None of these Plaintiffs would have suffered these adverse employment actions but for IBM's ageist scheme to rid itself of older workers described *supra*. To

wit, the circumstances surrounding Plaintiffs' firings contain all the common patterns and tactics of the discriminatory scheme.

35.     Those tactics detailed *infra* by the Plaintiffs include (i) being selected for termination, without any grounding in performance or merit-based reality; (ii) pre-selected for termination by someone or some *thing* other than their manager; (iii) being replaced by younger, less-qualified employees; and (iv) being told, directly and indirectly, that the company was focused on a younger workforce. Similarly situated plaintiffs in other lawsuits have repeatedly told the same stories, supported by documentary evidence. Each these Plaintiffs' specific circumstances are as follows.

### A.  MICHAEL NOLAN

36.     Michael Nolan dedicated over forty-two years of his life to IBM as a loyal, high-performing employee. IBM hired in 1981 and proceeded to promote him multiple times, assigning him to high profile positions. He was awarded twenty-three (23) skills certification badges, and he was consistently paid bonuses to reward his stellar work performance. He was given high marks on annual performance reviews. Nevertheless, his employment was terminated.

37.     In 1990, IBM named him the Assistant to the General Manager for IBM Desktop Software. In 2001, he led the acquisition of the Informix company. In 2013, on his own initiative, he created the company's Product Management Dashboard. In 2018, he was named the Synergy Executive for the landmark Red Hat acquisition. By the beginning of 2023, Nolan had been an executive for 20+ years and was the Director of Strategy and Planning where he led strategic planning efforts for the IBM Software Unit.

38.     There, he coordinated the development and review of the annual Strategy deliverables, communicated those strategies and actions to the rest of the company, and was the Software Unit liaison to the corporate staff for their projects. IBM never once warned or disciplined Nolan for

poor performance or otherwise, nor did IBM ever place him on any manner of performance improvement plan in his decades with the company.

39.     IBM crucially relies upon Spring Strategies and Fall Plans to analyze and steer each division of the company from a macro/executive level. Nolan's leadership roles in driving the Spring and Fall Plans for the IBM Software division cannot be overstated. In 2022 alone, Nolan was named as the lead and editor-in-chief for the Software Spring Strategy project; and the co-lead (with Finance), for the Software Fall Plan. He also served in the same year (as in prior years) as (i) the content lead and project manager for the Board of Directors Strategy Review project; (ii) the creator, designer, and team manager for the Product Management Dashboard; and (iii) the shadow manager and subject matter expert.

40.     Nolan was also given vital duties for Mergers & Acquisitions projects, Operational Analytics projects, the Corporate Strategy Guild program, the cross-IBM monthly strategy exchange, the EPM project, and the DealSpace project. Amazingly, he also managed to log 47 hours of continuing education time in 2022 through IBM's Think40 program and served as a formal mentor while handling all of these other job duties.

41.     In sum, Michael Nolan was a high caliber employee whose immediate track record should have made it unthinkable to consider him for layoff—much less the alleged elimination of his absolutely vital job duties for the company. Nevertheless, IBM ultimately rewarded his four decades of high caliber work performance by (i) discriminating against him based on age, and (ii) retaliating against him as a whistle blower by laying him off for alleged "job elimination" reasons.

42.     For years, Nolan had witnessed firsthand how IBM's new C-suite executives were tearing apart the fabric of the company by laying off older workers *en masse*, many of whom had staffed

important leadership roles and had been responsible for advancing IBM's interest for decades all across the company. He watched as talented friends and colleagues were picked off by IBM's ageist layoff schemes. He gained firsthand knowledge of guidance IBM gave to its managers to exclude from layoffs Early Professional Hires—coded language for "young"—and other demographics IBM wanted to see increase within its workforce. Nolan witnessed directives that mandated that employees chosen for layoffs could not be considered for inter-company transfers, and saw IBM HR show extreme preferences for his younger employees over older top contributors in his unit. He also witnessed the forced march of delivering poor performance reviews for any employee HR had secretly "pre-identified" for layoff. Eventually, the ageist executives within the company came for him.

43.     For many years, Nolan directly reported to John Thompson (VP), who reported to Tom Rosamilia (SVP). In early 2023, Nolan was reassigned to work under Brian Golleme, who told Nolan in February of 2023 that he "couldn't do his job without him." IBM executives John Thompson and Tom Rosamilia likewise gave Nolan high marks in his 2022 performance review, which contained no negative feedback whatsoever from any source. Golemme's well-placed reliance on Nolan made it all the more surprising when IBM informed Nolan in March of 2023 that the company would not be giving him the customary raise, equity, or Annual Incentive Payment bonus for the first time. He asked his direct supervisors why—and he asked to speak with whoever made that decision. IBM never gave him a straight answer.

44.     This coincided generally in time with an incident where his second line manager, Mihir Shah, began referring to him as the company "historian" as commentary on his age and long experience with the company. Shah also began exhibiting a dismissive attitude toward senior staff members and noticeably sidelined Nolan and similarly-aged executives from new projects. The

writing was on the wall—Nolan had been targeted for a layoff based on his age—and he proceeded to file a formal internal complaint to blow the whistle about the age discrimination being perpetrated against him and others.

45.     Fifteen days later—and less than two months after his direct supervisor told him he was essentially irreplaceable—IBM responded to his whistle blowing by notifying him that the company was terminating his employment. IBM claimed it was eliminating his position and was thus laying him off as part of one of its infamous Resource Actions. At time of his termination, Nolan was 63 years old. He was the oldest member of his team. In reality, IBM delegated most of his job duties to Ali Yasin—mid-thirties in age—and tasked Nolan with helping his young replacement learn how to do his job. In Yasin's own words, he was hired to do things in a "new way."

46.     During the pendency of his layoff, Nolan applied to transfer to a plethora of other positions within IBM so that he could do what he always had intended to do—continue working at IBM as a "lifer" until he was ready to retire. He was not allowed to apply to down-level jobs in the company. HR responded to his protests that the company would not allow Band D executives to be "down-levelled." Most Band D executives are organically within the ADEA-protected class by nature of how much time it historically takes to achieve such a rank. This new anti-down-levelling policy thus functioned as a thinly-veiled tool to keep older laid-off employees from re-entering the company and thus potentially frustrating IBM's overall goal of achieving a younger workforce.

47.     The job roles Nolan ultimately submitted a transfer request for included, but were not limited to, Strategy Director of Brand, Director of Product Management for Hybrid Data Management, multiple Senior Product Marketer positions, AI Infrastructure Business Development Executive, Business Development Executive for the DoD USAF client account,

Quantum Project Manager, Leadership and Change Consultant, Business Development Executive for the Microsoft client account, External Communications & Marketing Leader for Automation, Technical Sales Executive for AI Foundation Models, Service Product Manager, Data Scientist Technical Lead, Business Development Operations Manager, and Treasury Transformation Leader. Nolan was rejected from every single one.

48.     Nolan was more than qualified for the positions he sought to transfer into. Cynically, it should be no surprise that IBM rejected every transfer request he submitted. Three of the most likely transfer positions were pulled out from under him in the final days of his employment. One hiring executive had even formally approved him as qualified for one of his applied-to positions before the opportunity was unceremoniously and inexplicably stripped from him by IBM.

49.     IBM's firing of Nolan cost the company a talented, high-performing veteran employee, but it achieved the goal of the ageist scheme. It also amounted to retaliation, because they got rid of an employee who had openly brought attention to illegal practices. IBM's clear efforts to thwart Nolan's attempts to transfer within the company served as yet another example of IBM's commitment to ageism and prove that IBM's "job elimination" explanation was mere pretext for the company's illegal discrimination against Michael Nolan. Accordingly, but for the ageist scheme, Nolan would not have been terminated.

**B. KARLA BOUSQUET.**

50.     Karla Bousquet was employed with IBM for over 26 years. Hired in 1996, she began her career in France. In 1999 she moved to the United States on an international assignment and permanently relocated in 2004. During her tenure at IBM, she worked in various roles, including as a Public Relations Program Manager, Communications Manager for Network Computing Solutions, Corporate Media Relations Manager, Workforce Diversity Leader, Director of Strategic

Programs, Director of Client Executive Marketing, VP of Strategic Events and Global Recognition Experiences, and VP of CEO Events.

51.    Her career at IBM was a success by all objective metrics. She received consistent raises, promotions, and positive performance reviews.  In 2014 she was promoted to a Band C Executive. In that role she worked with the highest-ranking IBM executives.

52.    In 2021, she was nominated by her superiors to join the Page Society's Future Leaders Experience, an elite program for top performing communication specialists. In December 2022 she was given expanded management responsibilities which doubled the number of individuals that reported to her.

53.    Bousquet contributed to many of IBM's most prestigious events including the IBM Centennial THINK Forum, Big Bets, the Word Economic Forum, as well as the Masters and the US Open.

54.    During her time at IBM, she witnessed the company increase its focus on younger workers. Euphemisms like building our "future pipeline" and "revitalizing" the workforce were used to describe what was so clearly obvious. IBM was using executive headcount to focus on hiring and promoting younger employees, many of whom were located outside the US. She watched as younger, less experienced, and less talented individuals were promoted—while the older, more experienced employees were passed by and fell victim to layoffs. Even as a manager, she was asked not to promote qualified, seasoned, and older employees. Instead, she was instructed to promote their younger colleagues.

55.    Bousquet also witnessed rounds and rounds of layoffs over many years that conspicuously removed the older employees while sparing their younger counterparts. These layoffs would then be accompanied by retitling the jobs so subsequent backfills were harder to detect.

56.     Even during the Covid shutdown, Bousquet delivered an outstanding virtual recognition program for 2000 IBMers and was then asked to create and execute new programs post-Covid, launching IBM Golden Circle and IBM Tech—massive events intended to recognize IBM's top talent. For her role in developing and putting on these events, Bousquet received praise from the highest levels of the company. Her manager stated, "[Bousquet] played a key role in designing the recognition strategy for 2022/2023—recently approved by the HR team and the CEO with events (Golden Circle and 2 technical events) for 2023… As everyone notes, [she] is the ultimate collaborator and team player. She plays a key role on our team—and works across all functions and business units to get the job done."

57.     Accordingly, her performance review for 2022 was glowing. Her manager stated that she did not have any areas of improvement for [Bousquet], praising her "energy and enthusiasm" and stating, "I think she is an incredible leader."

58.     Despite her unparalleled success, in June 2023, she was selected to be laid-off. At the time of her termination, Ms. Bousquet was 52 years old. She was one of the oldest members of her team. Ms. Bousquet was told her job functions were being eliminated. That was false. In fact, two people took over her duties.

59.     The lay-off was companywide, and Bousquet observed in her department it only impacted older workers. It was clear none of the younger employees were impacted.

60.     Bousquet was also told that she was not likely to get any other job within IBM. Despite having worn so many hats over the years, she was now unable to fill any other executive role in the company. It was clear what was happening. She was being pushed out to make room for younger employees.

61.     Consistent with what she witnessed so many times in the past at IBM, the layoff that impacted her disproportionately removed the older employees. As always happened, it was then followed by a reorganization that muddled the water of who was backfilling the vacated roles, including Bousquet's. However, through the thinly veiled cover, it is clear that older employees were pushed out by the layoff, as the business group she once led is now managed by a much younger senior executive. Accordingly, but for the ageist scheme, Bousquet would not have been terminated.

### C. JAY ZELTZER

62.     Jay Zeltzer's illustrious career with IBM spanned over twenty-five (25) years. Hired in 1995 and then re-hired in 2000, Mr. Zeltzer's spent his career at IBM in high-level sales roles where he worked with IBM's top clients and generated business and revenue critical to the success of IBM.

63.     During his tenure, Mr. Zeltzer had a proven track record of success. He was a highly regarded IBM sales leader who received eight (8) promotions, forty-three (43) eminence/monetary awards, and even reached IBM's highest non-executive job level—Band 10—where he remained for six years. Mr. Zeltzer also received consistent positive performance reviews throughout his career at IBM. In 2021, his supervisor even noted that "[Zeltzer's] tenure at IBM helps him navigate the organization with expediency and efficiently; and in 2022 his manager noted "Jay, you have skills and experience that are valuable."

64.     At the height of Mr. Zeltzer's IBM employment, he was responsible for a portfolio used by 7,500 clients, which generated $900 million annually for IBM. Mr. Zeltzer was frequently tasked with representing IBM at industry events both internationally and domestically, and IBM

relied on Mr. Zeltzer to train and equip IBM sales teams with strategic resources, content, and guidance to successfully drive sales and generate revenue.

65.     One example of Zeltzer's many successes occurred at the end of 2021 when he was instrumental in obtaining the business of General Motors Finance for one of the largest document migration projects in IBM history. The leadership at General Motors considered Zeltzer critical to the success of this project and requested he remain on the account.

66.     After years of success and merit-based promotions, Zeltzer began to notice a concerning and discriminatory practice take root at IBM—the promotion and elevation of younger workers over more seasoned and qualified employees. He watched as IBM demoted successful senior sellers to roles that had minimal impact on the overall success of IBM.

67.     Unfortunately, this discriminatory practice came for Mr. Zeltzer in 2022 when IBM intentionally changed the playing field to ensure his failure. Despite his countless successes—his hugely profitable 2021 and 2022 and having never received a negative performance review—Mr. Zeltzer was suddenly and mandatorily demoted to Band 9 in the first quarter of 2022. He was subsequently transferred to a new position covering smaller sales territories. IBM simultaneously brought in two younger new hires to work alongside Zeltzer—Anthony Fratantoni (35 years old) and Jessica Thompson (29 years old). In this demoted position, Zeltzer was expected to maintain the same quota he had with his prior, larger sales territory, and he was to train the new young hires. Unbeknownst to Zeltzer, he was training his younger replacements.

68.     Zeltzer's attempts to transfer internally to positions he was well qualified for were also blocked, despite other IBM managers desiring his placement within their group and despite clients such as General Motors Finance "respectfully begging you [IBM] to assist us and do whatever is

necessary to ensure Jay Zeltzer remains with GM Financial. . ." IBM disregarded this client's sincere request and nevertheless put Zelter in a demoted role that was destined to fail.

69.    Zeltzer's IBM tenure was abruptly cut short when he was baselessly placed on a performance improvement plan, terminated, and given a nonsensical explanation for why his successful job performance history at IBM was deficient. In 2023, he was put on a Formal Performance Improvement Plan ("PIP"). The PIP program was utilized by IBM not for "performance improvement," but as a cover for their scheme to make IBM's workforce younger by terminating older workers. It was effectively a formality for IBM to end Zeltzer's successful career. By being placed in the PIP program, Mr. Zeltzer was further blocked for eligibility for internal transfer within IBM despite being eminently qualified for another position. Despite making every effort to succeed in a demoted position destined for failure, Mr. Zeltzer, at the age of 57, was terminated from IBM on August 15, 2023. The termination that would not have occurred but for IBM's ageist scheme.

### D.    TERESA COOK

70.    Teresa Cook was employed with IBM for over 27 years before she was abruptly terminated. She began her career in London, England on an international assignment, which IBM renewed multiple times, before asking her to permanently relocate to the United States in 1999. During her tenure at the company, she received numerous awards and promotions, swiftly advancing from various Manager positions to Director roles. Then she advanced to being a Vice-President of IBM Global Technology Services Product Marketing—a Band C Executive Position. In 2019, she was promoted to Chief Marketing Officer (CMO) of IBM's Industry Platforms Business Unit. In her role as CMO, she oversaw all marketing for the business unit and worked with IBM's highest-ranking executives. As CMO, Cook implemented an account-based marketing program focused

on the top 100 IBM accounts, which resulted in incremental revenue growth in the majority of accounts.

71.     Cook's career at IBM was incredibly successful. She received numerous promotions, raises, performance bonuses, awards, and consistent high-performance reviews. Cook was sponsored by IBM to attend and complete the Chief Marketing Officer Program at the prestigious Northwestern University Kellogg School of Management. She also published widely circulated articles on various marketing topics. Cook was consistently selected to represent IBM at national conferences, including the I.T. Marketing Service Organization (ITSMA) Leadership Summit—a globally renowned conference attended by many of the brightest marketing minds in the technology industry.

72.     After a successful twenty-four years in IBM Marketing, she was asked to take over a role in IBM Technology and Sales—where she successfully led and managed the Integrated Account MD Program, one of IBM's coveted Top 100, $100 million accounts.

73.     Given Cook's track record of developing high performing, cohesive teams, she was tasked in 2022 with implementing and spearheading a new program coined the "Executive Advocate Program," which her direct manager described as "a significant cultural shift by our senior leaders across IBM's most important technology and transformation accounts." The program was wildly successful and drove over 10% of incremental revenue for IBM. In her performance review, Cook's direct manager commended her for smoothly executing such a complex program launch.

74.     In fact, the program was such a success that Cook was selected for another strategic assignment in July 2022 and asked to take on even more responsibilities, establishing and leading a brand-new mission branded IBM TechXChange, which she successfully developed and prepared for launch in November 2022. In her performance review, her manager applauded Cook's

development of the program, deeming it a success and commented that "Teresa's strengths in the ongoing coaching of the team" led to its success.

75.    Despite her continued demonstrable success, Cook was continuously reminded by HR in the months leading up to her termination of her eligibility for IBM's voluntary retirement plan. She was even asked, more than once, if she planned on retiring. Cook, who was consistently being promoted within IBM and selected for more expansive roles, advised IBM that she had no desire or intention to retire. This pushing of older workers towards an unsolicited and unwanted retirement is directly out of the IBM playbook of past and present discriminatory schemes described in more detail above.

76.    Right on cue, in December 2022, after successfully developing TechXChange and leading the Executive Advocate Program, Cook was informed that her position was being eliminated and that she needed to look for another role. Ms. Cook was terminated at age of 55. When she asked for an explanation, HR told her the job elimination was due to "politics," and had nothing to do with her performance. Cook's termination without any direct connection to her job performance, but rather ambiguous explanations from HR staff that were not in Ms. Cook's direct management chain, is another in a long list of IBM tactics when targeting older workers for termination. Cook was subsequently advised that her manager's role was also being eliminated. Having significant experience, demonstrated skill, and seniority at IBM, Cook requested to be interviewed for her manager's revised role. She was repeatedly denied the opportunity without explanation.

77.    Upon further investigation, Cook discovered that she and her manager's roles were not being eliminated, but rather re-organized, re-branded, and given to a younger employee with significantly less experience, skill, and tenure at IBM. Once again, the re-branding of roles, which

are effectively a distinction without a difference, is consistent with IBM's discriminatory schemes designed to replace older, more experienced employees with younger, less experienced workers.

78.     Cook ultimately filed an internal complaint at IBM, known internally as the Open-Door Process, complaining that she was being discriminated against based on her age. A mere month later, she was selected to be laid-off as part of an infamous Resource Action. Despite IBM touting the Open Door process as an independent, unbiased review of employee concerns, Cook's very serious allegations of management discrimination were responded to by telling her to discuss with her manager, an incredible violation of the spirit and letter of the Open Door process's stated goal of independence and confidentially. The substance of Cook's allegations went un-answered.

79.     During her remaining time at IBM—when she wasn't helping train her younger replacement—Cook actively pursued her internal IBM network for a position but was consistently denied job opportunities without explanation. She was ultimately informed by HR that no job openings would be available until, coincidentally, after her separation date. It was clear that she was being pushed out permanently and IBM had no intention of placing her in a new role—because of her age.

80.     Consistent with many other Plaintiffs' experiences at IBM, Cook was replaced by a younger, less experienced, employee under the guise of a "reorganization," a tactic employed by IBM to attempt to muddy the waters as to who was backfilling the vacated roles. Accordingly, but for the ageist scheme, Cook would not have been terminated.

## VI.    <u>CAUSES OF ACTION</u>

**Count 1: Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et. seq.* ("ADEA") On Behalf of all Plaintiffs.**

81.     Plaintiffs incorporate by reference all allegations in this Complaint.

82.    IBM terminated or constructively terminated Plaintiffs because of their age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1).

83.    IBM's violation of the ADEA was knowing and willful.

84.    As a direct and proximate result of IBM's age discrimination, Plaintiffs have lost their jobs and sustained and will continue to sustain wage and benefit losses and have incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

85.    As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiffs have lost earnings capacity.

**Count 2: Retaliation under Title VII, 42 U.S.C. § 2000e-(3)(a) ("Title VII") On Behalf of Plaintiffs Nolan and Cook.**

86.    Plaintiffs Nolan and Cook incorporate by reference all allegations in this Complaint.

87.    IBM retaliated against Plaintiffs Nolan and Cook for opposing IBM's unlawful employment practice of discriminating on the basis of age, by terminating them from their employment and preventing them from obtaining other employment at IBM in violation of 42 U.S.C. §2000e-(3)(a).

88.    IBM's violation of Title VII was knowing and willful.

89.    As a direct and proximate result of IBM's age discrimination, Plaintiffs Nolan and Cook lost their jobs and sustained and will continue to sustain wage and benefit losses and have incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

90.    As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiffs Nolan and Cook have lost earnings capacity.

**Count 3: Wrongful Termination in violation of Public Policy Against Age Discrimination, Virginia Human Rights Act, Va. Code §§ 2.2-3900, *et seq.* ("VHRA") On Behalf of Plaintiff Nolan.**

91.    Plaintiff Nolan incorporates by reference all allegations in this Complaint.

92.     IBM terminated Plaintiff Nolan because of his age in violation of the Virginia Human Rights Act, Va. Code. §§ 2.2-3900.

93.     IBM's violation was knowing and willful.

94.     As a direct and proximate result of IBM's age discrimination, Plaintiff Nolan lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

95.     As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff Nolan has lost earning capacity.

**Count 4: Discharging Individual For Discrimination based on Age, District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq*. On Behalf of Plaintiff Bousquet**

96.     Plaintiff Bousquet incorporates by reference all allegations in this Complaint.

97.     IBM terminated Plaintiff Bousquet because of her age in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq*.

98.     IBM's violation was knowing and willful.

99.      As a direct and proximate result of IBM's age discrimination, Plaintiff Bousquet lost her job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

100.     As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff Bousquet has lost earning capacity.

**Count 5: Age Discrimination Under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. Ann. § 56a-60(a)(1). On Behalf of Plaintiff Cook.**

101.     Plaintiff Cook incorporates by reference all allegations in this Complaint.

102.    IBM terminated and retaliated against Plaintiff Cook because of her age, and because she opposed unlawful age discrimination at IBM, in violation of Conn. Gen. Stat. Ann. § 56a-60(a)(1) *et seq*.

103.    IBM's violation was knowing and willful.

104.    As a direct and proximate result of IBM's age discrimination, Plaintiff Cook lost her job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

### Count 6: New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* (On Behalf of Plaintiff Zeltzer).

105.    Plaintiff Zeltzer incorporates by reference all allegations in this Complaint.

106.    IBM terminated Plaintiff Zeltzer in violation of New York State Human Rights law prohibiting discrimination on the basis of age.

107.    IBM's violation was knowing and willful.

108.    As a direct and proximate result of IBM's age discrimination, Plaintiff Zelter lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

### VII.    JURY DEMAND

109.    Plaintiffs request a trial by jury on all claims against all Defendants.

### VIII.    DAMAGES

110.    WHEREFORE: Plaintiffs Nolan, Bousquet, Zeltzer and Cook requests the Court enter judgment and relief as follows:

1) That IBM be ordered to pay these Plaintiffs back pay and benefits with interest;

2) That a final judgment in favor of these Plaintiffs against IBM be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiffs;

3) That IBM be ordered to reinstate Plaintiffs to their respective former positions with all lost pay and benefits, seniority and promotions;

4) That in the alternative to reinstatement, IBM be required to pay these Plaintiffs front pay and benefits in the event reinstatement is not feasible;

5) Penalties available under applicable laws;

6) Costs of this action incurred herein, including expert fees;

7) Attorneys' fees;

8) Pre-judgment and post judgment interest, as provided by law, and

9) Such other and further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
512/476-4600
512/476-5382 (Fax)

By:_____
    Heidi A. Coughlin
    State Bar No. 24059615
    hcoughlin@w-g.com
    Brantley Ross Pringle, Jr.
    State Bar No. 16330001
    rpringle@w-g.com

AND

PATRICK | DOERR PLLC
1325 Avenue of the Americas, Floor 28
New York, New York 10019
212/680-4052

By: /s/ Mark T. Doerr
Mark T. Doerr, Esq.
State Bar No.
mark.doerr@patrickdoerr.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of May 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the Court and Defendants' counsel of record.

_____
Heidi A. Coughlin